UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TANYA S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-02521-TWP-TAB |
| | ) |
| NANCY A. BERRYHILL, Deputy Commissioner | ) |
| for Operations, Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Tanya S. ("Claimant"), *pro se*, requests judicial review of the final decision of the Deputy Commissioner for Operations of the Social Security Administration (the "Deputy Commissioner"), denying her applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[2] For the following reasons, the Court **AFFIRMS** the decision of the Deputy Commissioner.

## I. BACKGROUND

### A. Procedural History

In April 2014, Claimant filed applications for DIB and SSI, alleging a disability onset date of September 24, 2011. Her claims were initially denied on July 29, 2014, and again upon

---

[1] In an attempt to protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

reconsideration on September 5, 2014. Claimant filed a written request for a hearing on October 21, 2014. On February 23, 2016 a hearing was held before Administrative Law Judge Kimberly Sorg-Graves (the "ALJ"). Claimant appeared at the hearing *pro se* with her father, who testified on her behalf. On August 26, 2016, the ALJ denied Claimant's applications for DIB and SSI. Claimant requested review of the decision by the Appeals Council, which affirmed the ALJ's denial of benefits on June 13, 2017. On July 26, 2017, Claimant filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.** **Factual Background**

At the time of her alleged disability onset date in September 2011, Claimant was 35 years old. She was home-schooled from third through twelfth grade and received her GED. Prior to the onset of her disability, Claimant's last employment was providing social services to special needs adults, but she was terminated in late 2011. She alleges her disability began in September 2011.

**1.** **2014 Termination**

Claimant suffers from depression and has been treated for bipolar disorder. She has great difficulty reading, and of the things she can read, she often has trouble understanding them. In late 2011, the stresses of her job became too much for her, and she was disruptive to a patient/client at work. ([Filing No. 12-7 at 37](#).) Police forcefully escorted Claimant to Midtown Mental Health Services, where a health professional evaluated her and prescribed her Depakote for bipolar disorder. *Id.* On follow-up she was feeling better, and the physician assistant who treated her continued her on Depakote. *Id.* at 36-37. However, she lost her job following the incident. ([Filing No. 12-2 at 51-52](#).)

### 2. Subsequent Medical Evaluations

In May 2012, psychologist Patsy Donn ("Dr. Donn") evaluated Claimant to determine her intelligence and ability to function. ([Filing No. 12-7 at 50-59](Filing No. 12-7 at 50-59).) Claimant took three tests at this evaluation, the Stanford Binet Intelligence Scales – Fifth Edition, the Woodcock-Johnson III, Tests of Achievement, and the 16 PF Fifth Edition. *Id.* She obtained a full-scale IQ score of 78, which is in the borderline range. *Id.* at 52. Her knowledge score was in the third percentile, indicating that her accumulated fund of knowledge was weak. *Id.* She also had weak numerical problem solving and visual spacing processing, but average skills in inductive and deductive reasoning and working memory. *Id.* Her written expression score was low average (late third grade), while all other academic skills were borderline. *Id.* at 52-54. Her math fluency was what was expected of beginning fifth graders; her writing fluency was at the end of fourth grade level; and her reading fluency was at the beginning of fourth grade level. *Id.* at 53.

Dr. Donn diagnosed Claimant with recurrent major depressive disorder and borderline intellectual functioning. *Id.* at 55. She suggested further psychiatric evaluation to determine the effectiveness of the medication Claimant was taking at that time, and thought that effective treatment for Claimant would involve therapy to address coping skills and other issues and possible accommodations in the work setting that could include written instructions being left on her voicemail, a co-worker who could read any important information for her, and other measures that would reduce her need to read. *Id.* Dr. Donn noted that Claimant wanted to be a beautician. *Id.* To become a beautician, Dr. Donn believed Claimant would need support in completing her training, which included effective treatment of depression. *Id.*

In July 2014, Claimant was evaluated by consulting psychologist Paul Schneider ("Dr. Schneider"). ([Filing No. 12-7 at 45-49](Filing No. 12-7 at 45-49).) Dr. Schneider reported Claimant's "calculations and fund

of knowledge were poor", but her concentration level was neither a relative strength nor weakness. *Id.* at 45-46. Her verbal comprehension and judgment were somewhat impaired. *Id.* at 46. She indicated that her mood was fine, and Dr. Schneider observed that it seemed normal and her thought processes were logical and sequential. *Id.* Dr. Schneider's impression was that Claimant had borderline intellectual functioning and was a slow learner, both of which would affect her ability to work. *Id.* at 45-46. He diagnosed her with adjustment disorder, with mixed anxiety and depressed mood, by history, and borderline intellectual functioning. *Id.* at 47.

Dr. Schneider then administered the Wechsler Adult Intelligence Scale – IV (WAIS-IV). *Id.* at 48. This test scored Claimant's IQ at 70, placing her toward the extreme end of the borderline range but conforming to Dr. Schneider's observations of her. *Id.* at 47. He thought that although Claimant's score fell on the cusp of the borderline range and mild cognitive disability, the diagnosis of borderline intellectual functioning was more consistent with her level of adaptive functioning; thus, his diagnosis remained unchanged. *Id.* at 48.

Also, in July 2014, Claimant was evaluated by state agency reviewing psychologist Stacia Hill, Ph.D. ("Dr. Hill"). (Filing No. 12-3 at 5.) Dr. Hill concluded Claimant was mildly limited in activities of daily living and social functioning and moderately limited in concentration, persistence, and pace. *Id.* at 5-6. She believed Claimant could understand, remember, and carry out simple tasks, relate on at least a superficial and ongoing basis with supervisors and co-workers, attend to tasks for a sufficient amount of time to complete them, and manage the stresses involved with simple work. *Id.* at 8. In September 2014, Joelle J. Larsen, Ph.D. affirmed Dr. Hill's report.

### 3. Other Medical Information

In May 2014, Claimant and her father both filled out "function reports," which aim to illuminate how an applicant's illnesses, injuries, or conditions limit her activities. ([Filing No. 12-6 at 19](#).) In her function report, Claimant reported that on a typical day she showered, ate breakfast, took care of her children, did chores, had lunch, played with her children, made dinner, watched television, and helped her children get ready for bed. *Id.* She also fed and took care of her dog. *Id.* at 20. When asked what she was unable to do now that she could do before her illness, Claimant said that she needed help reading and understanding what she read. *Id.*

Beyond the things she did on a typical day, she was also able to tend to her personal care, prepare meals (but needed help reading and understanding recipes), do laundry, clean, go outside daily, and shop in stores. *Id.* at 19-21. She could not handle a savings account or checkbook because of her limited literacy but could pay bills and count change. *Id.* at 22. She played cards and took part in family gatherings and had no change in her social life since the onset of her illness. *Id.* at 23-24. She also indicated that she could walk for 30 minutes at a time before resting for 10 minutes, could pay attention for one hour, could finish what she started, did not follow written instructions well, followed spoken instructions well, had never been terminated due to problems getting along with co-workers or authority figures, did not handle stress well, and handled changes in routine well. *Id.* at 22-25. She added that she had a hard time with reading and understanding directions and with mental stress in a job setting. *Id.* at 26. Her father's function report provided similar answers. ([Filing No. 12-6 at 29-36](#).)

### 4. In-person Hearing

The ALJ presided over an in-person hearing at which Claimant and her father testified. ([Filing No. 12-2 at 29-68](#).) Claimant testified that she tried to go to beauty school but did not make

it too far because she could not handle the stress. *Id.* at 39-40. She went to vocational rehabilitation before trying to go to beauty school. *Id.* at 40-41. When asked about her level of education, Claimant revealed that she went to formal school through the third grade and then was home-schooled from fourth to twelfth grade. *Id.* at 42. She later obtained a GED. *Id.* at 45.

Claimant lived with her three sons, ages 18, 13, and 7. *Id.* at 44. She cooked, did laundry, took care of the household chores, and shopped for groceries. *Id.* She paid bills with her debit card and called the bank to get her balance but could not balance her checking account. *Id.* at 44-45. Claimant noted that she was fired from her last job in 2011 because she could not physically or mentally handle it. *Id.* at 51-52.

Claimant testified that she could not work because a job required her to read things and understand them, which was difficult for her and overwhelmed her. *Id*. She testified that without her father she would also struggle at home because she could not read her mail and so he read it to her. *Id.* She struggled with reading daily. *Id.* at 53. When she was at work and no one was bothering her she could handle her job, but when someone gave her a list of things to do, she would become overwhelmed and things would go wrong, and she was unable to handle the stress. *Id.* When things went wrong she would feel bad about herself and depressed. *Id.* But when she was in the comfort of her own home she would not feel those same stressors. *Id.*

At the time of her hearing with the ALJ, Claimant was not taking any medication because her time off work had reduced her stress level enough that she felt fine without it. *Id.* at 54. She did not think her weight prevented her from doing anything, but she complained about suffering from plantar fasciitis the previous month. *Id.* at 54-55. On an average day, she got her children ready for school, relaxed a bit, had her niece come over to ride the bus with one of her sons, did a daily devotion, made breakfast, took a shower, and worked out with her father three times a week

6

or played cards with him, took care of the children after school, and made dinner for the family. *Id.* at 56. Claimant reiterated that she struggled with reading and writing and other subjects. *Id.*

Claimant's father testified at the hearing that Claimant struggled reading the mail, so he would read it to her. *Id.* at 57. He said she did a pretty good job of taking care of her home and that he was there to help financially and to drive her places. *Id.* He was her only means of transportation because she lost her license after she got in a car accident and did not have insurance. *Id.* at 43. Claimant's father indicated that her main problem was with reading things and understanding those things.

Kathleen L. Reis, a vocational expert ("the VE"), also testified at the hearing. *Id.* at 58. The ALJ asked the VE whether a hypothetical individual with Claimant's intelligence, level of education, and illness could perform the work Claimant had done in the past. *Id.* at 61-64. The VE answered that she could not, but she could perform three representative unskilled medium jobs, all of which had a Specific Vocational Preparation of level 2 and required language skills at level 1. *Id.* at 63.

## II.   DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after she establishes that she is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

7

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then her residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant can perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given her RFC and considering her age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if she can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the

claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold the ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

The ALJ first determined that Claimant met the insured status requirement of the Act through March 31, 2015. ([Filing No. 12-2 at 15](Filing No. 12-2 at 15).) The ALJ then began the five-step sequential

evaluation process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since December 31, 2011, the last day she worked at her most recent job. *Id.* at 15-16. At step two, the ALJ found that Claimant had the following severe impairments: borderline intellectual functioning, history of learning disability, and adjustment disorder with mixed anxiety and depressed mood. *Id.* at 16-17. At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Claimant had the RFC to perform work under certain conditions:

> In considering these reports, I note that the evidence, including vocational expert testimony, confirmed that the claimant was able to sustain semi-skilled, and even skilled, levels of work for significant periods of time.
>
> The relatively modest clinical findings, favorable response to treatment, and adaptive functioning shown above do not reflect any episode of decompensation.
>
> ….
>
> In this regard, I conclude that the claimant's cognitive deficits from her borderline intelligence and adjustment disorder, in combination, would permit her to understand, remember, and follow simple instructions. She could not adjust to rapid complex changes in work assignments. Finally, due to her limited reading levels associated with her borderline intelligence and learning disability, the claimant further would be limited to tasks requiring only basic readings skills, and training by demonstration only.

([Filing No. 12-2 at 21](#)).

At step four, because Claimant did not suffer from stress or depression when she was in a comfortable setting, the ALJ could not determine there was no work she could perform. Although she could not perform any of her past relevant work, at step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Claimant could perform such as a kitchen helper, grocery bagger, or cook helper. *Id.* at 23-24. Having found that Claimant

could perform work in other jobs in the economy, the ALJ determined that she was not disabled. Therefore, the ALJ denied Claimant's applications for DIB and SSI.

## IV. DISCUSSION

Claimant's request for judicial review is brief. Her *pro se* Complaint merely asks the Court to review the judgment of the Deputy Commissioner and award Claimant social security disability benefits. (Filing No. 1 at 2.) Her brief in support contends that she satisfies the five-step test to qualify for benefits, including the final step, which asks whether there is other work in the relevant economy she can perform. Claimant then says:

> I, Tanya S[.], have a severe disability. I have previously submitted all the evidence and information to support this. My disability causes mental episodes which can lead me to be suicidal. I am not able to read or communicate verbally without assistance. My father, [ ], has to assist me with comprehension.

(Filing No. 14 at 2.)

The Deputy Commissioner made two primary arguments in her brief supporting the Social Security Administration's adjudication. First, the Deputy Commissioner argued the ALJ decided this case on a fully and fairly developed record, which means she accounted for all the information Claimant raises in her Complaint and brief when making her original decision. Second, the Deputy Commissioner noted that the ALJ supported her RFC finding with substantial evidence. That evidence included the results of two intelligence tests, reports from multiple psychologists, and the testimony of a vocational expert.

The ALJ's decision is supported by evidence and contains no error of law. Claimant's Complaint and her brief in support ask the Court to reconsider the evidence already considered by the ALJ. But the Court will not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). Claimant's Complaint and brief do not mention the ALJ's decision at all, other than to say that the Deputy Commissioner erred by

denying her claim. Claimant has raised no specific error or errors and the Court has not found any on its own.

Because the ALJ's opinion is supported by substantial evidence and contains no legal errors, the Court will not reverse and remand her determination.

## V. CONCLUSION

For the reasons set forth above, the final decision of the Deputy Commissioner is **AFFIRMED**. Claimant's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 11/29/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Tanya Schaunaman
8847 Medora Drive, 1H
Camby, Indiana 46113

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov